1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA – EASTERN DIVISION**

10

11  DONNA R. STEVENS,                    Case No. EDCV 19-0809-AS

12              Plaintiff,
                                        **MEMORANDUM OPINION**
13       v.

14  ANDREW M. SAUL, Commissioner
    of Social Security,[1]

15
                Defendant.
16

17

18                         **PROCEEDINGS**

19

20      On April 30, 2019, Plaintiff filed a Complaint seeking review

21  of the Commissioner's denial of Plaintiff's applications for a

    period of disability and disability insurance benefits ("DIB") and

22
    Supplemental Security Income ("SSI") under Titles II and XVI,

23
    respectively, of the Social Security Act. (Dkt. No. 1).  On October

24
    16, 2019, Defendant filed an Answer and the Administrative Record

25

26  _____

27      [1]  Andrew M. Saul, Commissioner of Social Security, is
    substituted for his predecessor.  See 42 U.S.C. § 405(g); Fed. R.
    Civ. P. 25(d).

28

1  ("AR").  (Dkt. Nos. 15-16).  The parties have consented to proceed

2  before a United States Magistrate Judge.  (Dkt. Nos. 11-12).  On

3  January 7, 2020, the parties filed a Joint Stipulation ("Joint

4  Stip.") setting forth their respective positions regarding

5  Plaintiff's claim.[2] (Dkt. No. 17).  The Court has taken this matter

6  under submission without oral argument.  See C.D. Cal. C. R. 7-15.

7

8  **BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

9

10  On August 3, 2010, Plaintiff, previously employed as a

11  receptionist and customer service representative (see AR 177, 953),

12  filed an application for DIB alleging a disability onset date of

13  October 1, 2009, which Plaintiff eventually amended to May 1, 2012.

14  (AR 116-22, 966).  Plaintiff's application was denied on February

15  24, 2011. (AR 97-102).  Plaintiff then requested a hearing before

16  an Administrative Law Judge ("ALJ") on April 5, 2011.  (AR 105;

17  see AR 20).  On November 15, 2011, ALJ Milan M. Dostal heard

18  testimony from Plaintiff, who was represented by counsel, and

19  vocational expert ("VE") Alan L. Ey.  (AR 62-96).  On March 14,

20  2012, ALJ Dostal issued a decision denying Plaintiff's application.

21  (See AR 20-28).

22

23  The Appeals Council then denied a request for review (AR 1-

24  3), and Plaintiff filed a complaint in this Court seeking review

25

26  _____

   [2]  The case was reassigned to the undersigned on April 2,
27  2020. (Dkt. No. 18).

28

of the Commissioner's decision.  (See Stevens v. Colvin, C.D. Cal. Case No. SACV 13-1531-FFM).   On November 13, 2014, the Court remanded the matter for further proceedings.  (Id., Dkt. No. 18; AR 1202-09).

Following this Court's remand order, on January 21, 2015, the Appeals Council observe that Plaintiff had also filed new DIB and SSI applications in 2013, pursuant to Titles II and XVI, respectively, which were then pending at the hearing level.  (AR 1212-13; see AR 1543-45).  The Appeals Council directed that these subsequent claims be consolidated with the 2010 DIB application, and that the ALJ issue a new decision on the consolidated claims. (AR 1212).

On May 18, 2016, ALJ Sharilyn Hopson held a hearing and received testimony from Plaintiff, who was represented by counsel, and from VE Susan Allison.  (AR 963-92).  During this hearing, Plaintiff amended her alleged disability onset date to May 1, 2012. (AR 966).  On July 21, 2016, ALJ Hopson issued a decision finding Plaintiff not disabled and denying her applications.  (AR 1274-97).  Plaintiff requested review by the Appeals Council, which granted review and remanded for further proceedings on January 6, 2017.  (AR 1298-1304).  On remand from the Appeals Council, ALJ Hopson conducted another hearing on January 31, 2018, receiving testimony from Plaintiff and VE Jeanine Metildi.  (AR 993-1011). On February 26, 2018, ALJ Hopson issued another unfavorable decision.  (AR 935-62.

1       On March 2, 2019, the Appeals Council denied Plaintiff's

2   request to review the ALJ's decision. (AR 923-26). Plaintiff now

3   seeks judicial review of the ALJ's February 26, 2018 decision,

4   which stands as the final decision of the Commissioner. See 42

5   U.S.C. § 405(g).

6

7                   **SUMMARY OF ADMINISTATIVE DECISION**

8

9       The ALJ applied the requisite five-step process to evaluate

10  Plaintiff's case. (AR 942-53). At step one, the ALJ found that

11  Plaintiff met the insured status requirements of the Social

12  Security Act through December 31, 2014, and had not engaged in

13  substantial gainful activity since May 1, 2012, her amended alleged

14  onset date. (AR 942). At step two, the ALJ found that Plaintiff

15  had the following severe impairments: irritable bowel syndrome;

16  fibromyalgia; lumbar discogenic disease with radiculopathy; status

17  post laparoscopic cholecystectomy; reflex sympathetic dystrophy

18  ("RSD"); osteoarthritis/bursitis of the hips; osteoarthritis of

19  the knees; status post pacemaker; asthma; and obesity. (AR 942).[3]

20  At step three, the ALJ determined that Plaintiff's impairments did

21  not meet or equal a listing found in 20 C.F.R Part 404, Subpart P,

22  Appendix 1.[4]  (AR 943).

23

24      [3]  The ALJ found Plaintiff's gastroesphageal reflux

25  disease, hypothyroidism, tremors controlled with medications, depression, and anxiety disorder to be non-severe impairments. (AR

26  942).

27      [4]  The ALJ specifically considered Listings 1.02 (major

28  dysfunction of a joint), 1.04 (disorders of the spine), 5.05

Next, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC")[5] to perform sedentary work, as defined in 20 C.F.R. §§ 404.1567(a), 416.967(a), with the following limitations:

> [Plaintiff] can lift and/or carry 20 pounds occasionally and ten pounds frequently; can stand for 15 minutes at one time and for a total of one hour during an eight-hour workday; can walk for 15 minutes at one time and for a total of one hour during an eight-hour workday; can sit for six hours during an eight hour workday with normal breaks, such as every two hours; must be allowed to use a cane for standing and walking; can frequently reach in all direction bilaterally; can frequently handle, finger, and feel bilaterally; can frequently push and pull with the upper extremities bilaterally; can occasionally use foot pedals bilaterally; cannot climb ramps, stairs, ladders, ropes or scaffolds; can occasionally kneel, stoop, climb, and crouch; cannot crawl; cannot work at unprotected heights or with moving mechanical parts; can occasionally operate a motor vehicle; can have occasional exposure to humidity and wetness; can have frequent exposure to dust, odors, fumes, and other pulmonary irritants; can have occasional

_____

(chronic liver disease), and 5.06 (inflammatory bowel disease). (AR 944).

[5]  A Residual Functional Capacity is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R §§ 404.1545(a)(1), 416.945(a)(1).

1      exposure to extreme cold; can have frequent exposure to

2      extreme heat; can have occasional exposure to commercial

3      vibration; is limited to a loud environment such as heavy

4      traffic; and must have close proximity to a restroom.

5

6 (AR 944). At step four, the ALJ found that Plaintiff was capable

7 of performing her past relevant work as a receptionist and customer

8 service representative. (AR 953). The ALJ thus concluded that

9 Plaintiff was not disabled. (AR 953-54).

10

11 **STANDARD OF REVIEW**

12

13      This Court reviews the Administration's decision to determine

14 if it is free of legal error and supported by substantial evidence.

15 See Brewes v. Comm'r, 682 F.3d 1157, 1161 (9th Cir. 2012).

16 "Substantial evidence" is more than a mere scintilla, but less than

17 a preponderance. Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir.

18 2014). To determine whether substantial evidence supports a

19 finding, "a court must consider the record as a whole, weighing

20 both evidence that supports and evidence that detracts from the

21 [Commissioner's] conclusion." Aukland v. Massanari, 257 F.3d 1033,

22 1035 (9th Cir. 2001) (internal quotation omitted). As a result,

23 "[i]f the evidence can support either affirming or reversing the

24 ALJ's conclusion, [a court] may not substitute [its] judgment for

25 that of the ALJ." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882

26 (9th Cir. 2006).

27

28

1                                   **DISCUSSION**

2

3       Plaintiff claims that the ALJ's RFC assessment is not

4 supported by substantial evidence. (<u>See</u> Joint Stip. at 5-9, 16-

5 18). While Plaintiff does not dispute the limitation to sedentary

6 exertion, she contends that she "lacks the ability to sustain such

7 level of activity on a full-time, consistent basis," particularly

8 due to her severe impairments of fibromyalgia and RSD (also known

9 as Complex Regional Pain Syndrome ("CRPS"). (<u>Id.</u> at 5). Plaintiff

10 also contends that the ALJ erred by failing to properly assess her

11 subjective complaints and to consider whether she can adequately

12 sustain the exertion level. (<u>Id.</u> at 5-9, 16-18).

13

14       After consideration of the record as a whole, the Court finds

15 that the Commissioner's findings are supported by substantial

16 evidence and are free from material legal error.[6]

17

18 **A.**    **<u>Legal Standard for Assessing Claimant's RFC and Evaluating</u>**

19      **<u>Subjective Statements</u>**

20

21    "A claimant's residual functional capacity is what he can

22 still do despite his physical, mental, nonexertional, and other

23 limitations." <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th

24 Cir. 1989) (citing 20 C.F.R. § 404.1545). An RFC assessment

25          [6] The harmless error rule applies to the review of

26 administrative decisions regarding disability. See <u>McLeod v.</u>

27 <u>Astrue</u>, 640 F.3d 881, 886-88 (9th Cir. 2011); <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005) (an ALJ's decision will not be

28 reversed for errors that are harmless).

requires the ALJ to consider a claimant's impairments and any related symptoms that may "cause physical and mental limitations that affect what [he] can do in a work setting."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  In determining a claimant's RFC, the ALJ considers all relevant evidence, including a claimant's statements and residual functional capacity assessments made by consultative examiners, State Agency physicians, and medical experts.  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); see also id. §§ 404.1513(c), 416.913(c).

When assessing a claimant's credibility regarding subjective pain or intensity of symptoms, the ALJ must engage in a two-step analysis.  Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017). First, the ALJ must determine if there is medical evidence of an impairment that could reasonably produce the symptoms alleged. Garrison v. Colvin, 759 F.3d 995, 1014 (9th Cir. 2014).  "In this analysis, the claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."  Id. (emphasis in original) (citation omitted).  "Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof." Id. (citation omitted).

If the claimant satisfies this first step, and there is no evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony about the symptom severity.  Id., at 1014-15.  see also Robbins, 466 F.3d

1  at 883 (9th Cir. 2006) ("[U]nless an ALJ makes a finding of

2  malingering based on affirmative evidence thereof, he or she may

3  only find an applicant not credible by making specific findings as

4  to credibility and stating clear and convincing reasons for

5  each."). "This is not an easy requirement to meet: The clear and

6  convincing standard is the most demanding required in Social

7  Security cases." Garrison, 759 F.3d at 1015 (citation omitted).

8

9       Where, as here, the ALJ finds that a claimant suffers from a

10  medically determinable physical or mental impairment that could

11  reasonably be expected to produce her alleged symptoms, the ALJ

12  must evaluate "the intensity and persistence of those symptoms to

13  determine the extent to which the symptoms limit an individual's

14  ability to perform work-related activities for an adult." Soc.

15  Sec. Ruling ("SSR") 16-3p, 2017 WL 5180304, at *3.[7]  SSR 16-3p

16  superseded SSR 96-7p and eliminated the term "credibility" from

17  the Agency's sub-regulatory policy. However, the Ninth Circuit

18  has noted that SSR 16-3p "makes clear what [the Ninth Circuit's]

19  precedent already required":

20

21       that assessments of an individual's testimony by an ALJ

22       are designed to "evaluate the intensity and persistence

23       of symptoms after the ALJ finds that the individual has

24

25       [7]  SSR 16-3p, which superseded SSR 96-7p, is applicable to
     this case, because SSR 16-3p, which became effective on March 28,
26  2016, was in effect at the time of the Appeal Council's March 2,
     2019 denial of Plaintiff's request for review. Nevertheless, the
27  regulations on evaluating a claimant's symptoms, including pain,
     see 20 C.F.R. §§ 404.1529 and 416.929, have not changed.

28

1    a medically determinable impairment(s) that could

2    reasonably be expected to produce those symptoms, and

3    not to delve into wide-ranging scrutiny of the

4    claimant's character and apparent truthfulness.

5

6    Trevizo, 871 F.3d at 679 n.5 (quoting SSR 16-3p) (alterations

7    omitted).

8

9        In discrediting the claimant's subjective symptom testimony,

10   the ALJ may consider: "ordinary techniques of credibility

11   evaluation, such as . . . prior inconsistent statements concerning

12   the symptoms, and other testimony by the claimant that appears less

13   than candid; unexplained or inadequately explained failure to seek

14   treatment or to follow a prescribed course of treatment; and the

15   claimant's daily activities." Ghanim v. Colvin, 763 F.3d 1154,

16   1163 (9th Cir. 2014) (citation omitted). Inconsistencies between

17   a claimant's testimony and conduct, or internal contradictions in

18   the claimant's testimony, also may be relevant. Burrell v. Colvin,

19   775 F.3d 1133, 1137 (9th Cir. 2014). In addition, the ALJ may

20   consider the observations of treating and examining physicians

21   regarding, among other matters, the functional restrictions caused

22   by the claimant's symptoms. Smolen, 80 F.3d at 1284; accord

23   Burrell, 775 F.3d at 1137. However, it is improper for an ALJ to

24   reject subjective testimony based "solely on a lack of objective

25   medical evidence to fully corroborate the claimant's allegations."

26   Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir.

27   2009) (citation omitted).

28

The ALJ must make a credibility determination with findings that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (citation omitted); see Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) ("A finding that a claimant's testimony is not credible must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.") (citation omitted).  Although an ALJ's interpretation of a claimant's testimony may not be the only reasonable one, if it is supported by substantial evidence, "it is not [the court's] role to second-guess it." Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

**B.  Plaintiff's Subjective Statements and Testimony**

In a function report dated October 25, 2010, Plaintiff reported that she suffered from fibromyalgia, as well as irritable bowel syndrome (IBS), acid reflux, hypothyroidism, and diverticulitis.  (AR 160).  Plaintiff wrote that she went grocery shopping one to three times a week, but could not "be out for more than 2 hours without feeling dizzy, weak, joint pain and sometimes nausea."  (AR 153).  Plaintiff reported that she bathed and dressed herself, fed and bathed the dog, and prepared meals and cleaned with help from her elderly mother.  (AR 153-54).  On Fridays, she would spend the day "slowly work[ing] on the house cleaning with [her] mother."  (AR 154).  Plaintiff did laundry, "light vacuuming"

11

and mopping, and pulled small weeds. (AR 154). Plaintiff reported, however, that "stress of any physical activity like cleaning" could result in "flu like symptoms," numbness in her arms and hands and pain in her feet, knees, thighs, and back. (AR 160). Plaintiff drove herself for short distance, but her limbs and hands would "go numb after using them for more than 15 minutes at a time." (AR 154). She watched television "off and on all day." (AR 157). She reported that she could lift about ten pounds, could not stand or walk for more than an hour without feeling sick, and could walk for less than a block. (AR 158). She stated that sitting for "to[o] long hurt[] her bottom and legs." (AR 158). She also had difficulty concentrating, and would lose her train of thought, but she could pay attention for a couple of hours if "not feeling dizzy." (AR 158).

     At the hearing in 2011, Plaintiff testified that she experienced pain "[e]verywhere," but mostly in her back, as well as her thighs and arms, and that the pain was brought on by "stress" or "anything," and her arms sometimes went "completely numb." (AR 70). Plaintiff testified that she also suffered from nausea. (AR 72). She stated that "all the jobs that [she] lost [were] due to sickness." (AR 72). She explained that there were "flu like symptoms accompanying pain," which was "kind of like stabbings in the muscle." (AR 72). Plaintiff stated that she experienced fibromyalgia symptoms every day. (AR 72-73). She took pain medications, such as Gabapentin, which helped, but she still felt pain; it was "not killing the pain totally." (AR 73). She also rested. (AR 72).

1     Plaintiff testified that on a typical day, she would "get
2  [her] son off to school," and then generally sleep for a couple
3  hours in the "early afternoon." (AR 73-74). Otherwise, on many
4  days, she said she lay in bed watching television, but felt "pretty
5  excruciating" pain when she got up after lying or sitting too long.
6  (AR 75-76). She stated that she could sit for an hour but not two.
7  (AR 76).

8

9     She said she bathed and dressed herself, and did light cooking
10 and cleaning, including vacuuming with "one of those little tiny
11 vacuums that's real light." (AR 78). She shopped for groceries,
12 and was able to load the groceries one item at a time. (AR 78-
13 79). She could lift a gallon of milk at most. (AR 77). She
14 testified that she would go shopping with her mother, and would
15 "have to move" or else she would "feel woozy and nauseas" and
16 "start going into pain." (AR 76). She stated that she could stand
17 and walk for an hour and a half at a time, if she kept moving. (AR
18 76). Afterward, she needed to sit or lie down. (AR 77). Plaintiff
19 testified that if she did anything "remotely physical for any
20 length of time," such as gardening for over an hour, she became
21 "sick" for "usually the next three days, sometimes a week." (AR
22 78). Plaintiff stated that she had "basically" been in bed for
23 the past two months. (AR 78).

24

25    On a function report from 2013 (see AR 1649-58), Plaintiff
26 reported that she could dress herself and take showers, but could
27 not get up from a bath and found it difficult to put on shoes. (AR
28 1650). She did light dusting and vacuuming, "a little at a time

1   so it [took] all day." (AR 1651). She prepared food but did not

2   "have enough energy to make complex dishes." (AR 1651). She

3   shopped twice a week, for thirty to sixty minutes. (AR 1652). She

4   reported that her only activity was watching television. (AR

5   1653). She could lift about ten pounds, could not stand in one

6   place without getting nauseous, weak, and dizzy, could walk or sit

7   for only ten minutes before feeling pain, and could pay attention

8   for about twenty minutes. (AR 1654).

9

10      In 2016, Plaintiff testified that she suffered pain

11   "everywhere," but it was worse in her legs and back. (AR 975-76).

12   She stated that the pain was in her arms "occasionally" but "not

13   every day." (AR 976). She described it as a "[t]ingling, kind of

14   numbing kind of a pain" that was "in [her] body almost all the

15   time." (AR 976). Plaintiff stated that she had four bad days a

16   week, when the pain was an eight or nine on a scale of ten. (AR

17   976-77). When the pain became that severe, "the only thing that

18   really help[ed]" was lying down, which "resolve[d] it." (AR 977).

19   Plaintiff stated that she would lie down for "[a]t least a couple

20   of hours." (AR 977). Plaintiff also stated that she had "constant

21   fatigue," which made her "just want to sleep." (AR 981). There

22   were also periods when she had "a real hard time concentrating and

23   focusing," but "not all the time." (AR 981).

24

25      Plaintiff testified that she could sit for about twenty

26   minutes before feeling pain, but could manage for about forty-five

27   minutes if she "pushed it." (AR 978). When she got up, she paced

28   around because it felt better when she moved. (AR 978). She said

14

she could stand in place for only about twenty minutes before her back started hurting. (AR 978). Plaintiff stated that she needed a cane to walk, and had needed it since she had a fall in September 2012. (AR 979). She could walk about half a block before needing to rest for about fifteen minutes. (AR 980). Plaintiff also testified that she had arthritis in her knees, for which she had a brace that she wore "[e]very once in a while." (AR 982-83).

Plaintiff stated that she showered and dressed herself and did some cooking and light cleaning, such as vacuuming and dusting. (AR 983-84). She could lift a ten-pound bag of flour, but could not lift twenty pounds. (AR 980). She drove herself for short distances, about three times a week, to the grocery store and doctor's appointments. (AR 973-74). Her treatment included "aqua therapy," which she said was helping. (AR 974).

In 2018, Plaintiff testified that her symptoms had worsened. (AR 996). She currently had flu-like symptoms and fatigue, and had been bedridden for three days. (AR 996-97). She had "a lot of pain" in her legs, hips, arms, neck, and back, and her hands would go numb if she "use[d] them for more than 15 minutes." (AR 997). She described the pain as being "like somebody's stabbing you with a knife in the bone in a rhythmic kind of way." (AR 1002). She stated that she "want[ed] to work" but "every time [she] tr[ied]," she got "sick." (AR 997-98). She explained that in 2016 she briefly took a job in customer service but felt "flu coming on again" about two weeks in. (AR 998, 1001). She then "ended up with a heart problem" and "ultimately had to have a pacemaker put

15

1   in." (AR 998, 1001). After a week back at work, they told her

2   "it just wasn't working out" because she "wasn't catching on." (AR

3   998). She then took a job as a cashier at Target but "got pneumonia

4   for two weeks" after her second week of work, and ended up "one of

5   the seasonal people they didn't keep." (AR 998). Plaintiff's

6   mother then passed away, making it difficult to function at times.

7   (AR 997, 998). She had maybe two good days a week, when she could

8   "go grocery shopping and do the things [she] need[s] to do," but

9   she spent the rest of the week mostly lying in bed or on the couch.

10  (AR 1000). In the eight hours from 9:00 to 5:00, she spent about

11  five or six hours lying down. (AR 1000-01).

12

13  **C.   The ALJ's Credibility Findings**

14

15       The ALJ found that Plaintiff's medically determinable

16  impairments could reasonably be expected to cause the alleged

17  symptoms, but her statements concerning the intensity, persistence

18  and limiting effects of these symptoms were "not entirely

19  consistent with the medical evidence and other evidence in the

20  record for the reasons explained in th[e] decision." (AR 946).

21

22       The ALJ observed that Plaintiff's physical examinations had

23  "largely been unremarkable, with [Plaintiff] noted as being in no

24  acute distress, with a normal gait, and no significant neurological

25  deficits." (AR 946). The ALJ found that Plaintiff's diagnostic

26  tests, including x-rays and MRI exams, generally showed "nothing

27  beyond some mild abnormalities." (AR 947). The ALJ noted that

28  Plaintiff's treatment "consisted primarily of conservative

measures which have been reported as helpful," (AR 946) and that
the records generally indicate that Plaintiff's conditions were
"stable" and "reflect [Plaintiff's] report that medications allow
her to be functional and 'able to perform typical house maintenance
duties, cooking, cleaning, [and] laundry' without adverse effects."
(AR 947) (citing AR 3137; quoting AR 3161).

The ALJ also found that Plaintiff had made inconsistent
statements and had admitted engaging in activities that suggested
she was not as limited as she alleged. (AR 948). As examples,
the ALJ noted that Plaintiff alleged that she spent most of her
time lying down, yet reported helping her son get ready for school
in the mornings, grocery shopping twice a week, preparing meals,
mopping, feeding and bathing the dog, swimming, pulling small
weeds, and other activities that did not involve simply lying down.
(AR 946, 948, 952). The ALJ observed, based on the statements in
the treatment notes, that Plaintiff seemed to have stopped working
"simply because she was understandably busy helping her mother,
who was undergoing treatment for breast cancer." (AR 947). After
Plaintiff's mother passed away, Plaintiff "reported she was looking
for work", and she "also reported she was keeping busy cleaning
and organizing her mother's house to prepare it for sale and did
not indicate having any difficulties with these activities." (AR
947) (citing AR 3088, 3106).

The ALJ thus concluded that "while [Plaintiff] may be somewhat
limited and clearly not capable of functioning at the level of
which she was previously capable," she was still "quite active and

competent and routinely perform[ed] activities which suggest[ed] she remain[ed] physically capable of meeting the demands of sedentary work," as set forth in the RFC. (AR 948-49). The ALJ further explained that she "found some of [Plaintiff's] allegations sufficiently supported by the medical evidence to warrant the establishment of some limitations beyond those set forth by medical sources," but found "some of her allegations (i.e., that she lies down most of the day) to be insufficiently supported to warrant adoption." (AR 952). The ALJ determined overall that "a limited range of sedentary work is consistent with the objective medical evidence and clinical findings and reflects those aspects of [Plaintiff's] allegations that are reasonably consistent with the record as a whole." (AR 952).

**D.  <u>Analysis</u>**

    As set forth below, the ALJ's evaluation of Plaintiff's subjective statements and testimony regarding her functional limitations was supported by specific, clear and convincing reasons backed by substantial evidence in the record. Plaintiff has failed to identify any material error in the ALJ's assessment.

    First, the ALJ appropriately found that Plaintiff's reported activities eroded her credibility because Plaintiff made inconsistent statements and had admitted engaging in activities that suggested she was not as limited as alleged. (See AR 948). As the ALJ noted, Plaintiff's reported activities included helping her son get ready for school in the mornings, grocery shopping

twice a week, preparing meals, mopping, feeding and bathing the dog, swimming, and pulling small weeds. (See AR 73, 78-78, 153-54, 973-74, 983-84, 1650-52) (Plaintiff's statements about dressing herself, showering, "get[ing] [her] son off to school" in the mornings, mopping, dusting and vacuuming, feeding and bathing dog, pulling weeds, preparing meals, shopping two or three days a week, driving to grocery store and appointments); AR 1836 (2014 treatment record noting Plaintiff's report that she "was swimming most days of the week" and was "doing well with pain and [weight] loss"); AR 3088: (2017 treatment record noting Plaintiff "[h]as been busy with cleaning and organizing the house, getting ready to sale"); AR 3161 (2016 treatment record stating that "[a]lthough [Plaintiff] reports high pain scores, current medication regimen allows her to be functional, able to perform typical house maintenance duties, cooking, cleaning, laundry"); AR 3195 (2016 treatment record noting Plaintiff could "walk 4-5 blocks with no symptoms"). The ALJ reasonably found that these activities conflicted with Plaintiff's claims of spending her days lying down due to debilitating pain. (See AR 78) ("I basically have been in bed for going on two months now, you know."); AR 1000-01) (testifying that she spends most of her days lying down)).

Plaintiff contends that the ALJ "failed to adequately explain how these routine activities translate into the ability to perform sedentary work on a full-time, competitive and sustained basis." (Joint Stip. at 9). However, Plaintiff's activities adequately support the ALJ's determination that Plaintiff's conditions were not as limiting as alleged. See Burrell, 775 F.3d at 1137

1  ("Inconsistencies between a claimant's testimony and the claimant's
2  reported activities provide a valid reason for an adverse
3  credibility determination."); Ghanim, 763 F.3d at 1165 ("Engaging
4  in daily activities that are incompatible with the severity of
5  symptoms alleged can support an adverse credibility
6  determination."); Molina v. Astrue, 674 F.3d 1104, 1113 (9th Cir.
7  2012) ("Even where [a claimant's] activities suggest some
8  difficulty functioning, they may be grounds for discrediting the
9  claimant's testimony to the extent that they contradict claims of
10 a totally debilitating impairment."); Burch v. Barnhart, 400 F.3d
11 676, 680-81 (9th Cir. 2005) (claimant's allegations of disability
12 properly discredited where claimant was able to care for her own
13 personal needs, cook, clean, shop, interact with her nephew and
14 boyfriend, and manage finances).

15

16     The ALJ also appropriately relied on the fact that
17 Plaintiff's treatment "consisted primarily of conservative
18 measures which have been reported as helpful." (AR 946).
19 Substantial evidence supports this finding. (See AR 2344 ("Overall
20 course = gradually improving with start of prednisone for RSD and
21 Naltrexone"; "pain has improved"); AR 2346 ("Patient responded well
22 to exercises."); AR 2363 ("Overall course = gradually improving
23 with start of prednisone for RSD and Naltrexone"; "pain has
24 improved"); AR 2705 (same); AR 2717 (same); AR 3137 ("Although she
25 reports high pain scores, current medication regimen allows her to
26 be functional, able to perform typical house maintenance duties,
27 cooking, cleaning and laundry, improved function and improved pain
28 interference."); AR 3148 ("pain in joints all over is improved when

she takes her nucyunta. . . . Doing well in aquatic therapy. [Plaintiff] states her lower back pain improves with swimming.")). In addition, as the ALJ noted, these records typically describe Plaintiff's fibromyalgia as "mild." (See AR 2344, 2363, 2694, 2705, 2717). Plaintiff's favorable response to conservative treatment was an appropriate basis to discount the severity of her allegations.[8] See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."); Tommasetti, 533 F.3d at 1040 ("The record reflects that Tommasetti responded favorably to conservative treatment . . . . Such a response to conservative treatment undermines Tommasetti's reports regarding the disabling nature of his pain."); Crane v. Shalala, 76 F.3d 251, 254 (9th Cir. 1996) ("evidence suggesting that [the claimant] responded well to treatment" supports an adverse credibility finding).

The record supports the ALJ's finding that Plaintiff's physical examinations had "largely been unremarkable, with [Plaintiff] noted as being in no acute distress, with a normal gait, and no significant neurological deficits." (AR 946; see AR 1712-14 (June 2015 exam, no acute distress, normal strength and

---

[8]    Plaintiff also claims that the ALJ failed to "cite to any evidence that there exists more aggressive treatment options or that the medical professionals have recommended them." (Joint Stip. at 8). However, the ALJ did not discount Plaintiff's statements based merely on her lack of more aggressive treatment, but because her conservative treatment had "been reported as helpful," (AR 946), improved her condition and enabled her to perform household tasks, such as cooking and cleaning, "without adverse effects." (AR 947).

sensory/neurological); AR 2322 (October 2013 exam, "No distress"); AR 2742 (February 2013 exam, "in no acute distress," "alert and oriented," negative straight leg raise, moderately decreased cervical and lumbar range of motion); AR 3128 (October 2016, "No apparent distress," full strength and full range of motion without pain in most areas, intact sensory, normal gait); AR 3141 (August 2016, "Pleasant," normal posture, ambulatory, grossly intact sensation, grossly normal strength); AR 3150 (July 2016, "No apparent distress," normal gait, full strength, intact sensory); AR 3160 (May 2016, no acute distress, grossly normal strength and sensory); AR 3092 (July 2017, "GENERAL: Pleasant").

The record also supports the ALJ's finding that Plaintiff's diagnostic tests generally showed "nothing beyond some mild abnormalities." (AR 947; see, e.g., AR 2277-78, 2996 (2012 myocardial perfusion rest and stress test, results normal); AR 2944 (2011 right shoulder x-ray, normal); AR 2168, 2651, 2947 (2012 right hip x-rays, normal); AR 2167, 2648, 2950 (2012 right knee x-rays, mild osteoarthritis and small joint effusion)); AR 2139, 2643, 2955 (2012 left knee x-rays, mild osteoarthritis); AR 2120, 2637, 2960 (2012 lumbar spine x-rays, normal); AR 1884 (2014 lumbar spine x-rays, mild degenerative disc disease and mild degenerative joint disease); AR 1763, 1827, 3023, 3037, 3170 (2015 and 2016 hip x-rays, mild osteoarthritis); AR 1756-57, 3021-22, 3035, 3143, 3157, 3174-75, 3185 (2016 lumbar spine MRI, mild scoliosis and degenerative disc disease); AR 3008 (2016 chest and ribs x-rays, normal).

The Court acknowledges that diagnostic tests and other objective measures may be of little value in assessing Plaintiff's impairments of fibromyalgia and RSD/CRPS. As Plaintiff points out, fibromyalgia "is a disease that eludes objective evidence."[9] (Joint Stip. at 6) (citing Benecke v. Barnhart, 379 F.3d 587, 594 (9th Cir. 2004)). As for RSD, "conflicting evidence in the medical record is not unusual . . . due to the transitory nature of its objective findings and the complicated diagnostic process involved."[10] SSR 03-2p. Indeed, an important characteristic of RSD is "that the degree of pain reported is out of proportion to

---

[9] Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." Benecke, 379 F.3d at 589. Typical symptoms include "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease. Id. at 590. Those suffering from fibromyalgia have normal muscle strength, sensory functions, and reflexes. Revels v. Berryhill, 874 F.3d 648, 656 (9th Cir. 2017). Because "there are no laboratory tests to confirm the diagnosis," fibromyalgia is assessed "entirely on the basis of patients' reports of pain and other symptoms." Benecke, 379 F.3d at 590; see Revels, 874 F.3d at 657 (a "diagnosis of fibromyalgia does not rely on X-rays or MRIs"). The Agency's regulations urge ALJs to consider "a longitudinal record whenever possible" because "the symptoms of fibromyalgia 'wax and wane,' and . . . a person may have 'bad days and good days.'" Revels, 874 F.3d at 657 (quoting SSR 12-2p)).

[10] "RSDS/CRPS is a chronic pain syndrome most often resulting from trauma to a single extremity. It also can result from diseases, surgery, or injury affecting other parts of the body. . . . The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of precipitating trauma. Later, spontaneously occurring pain may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone." SSR 03-2p. SSR 03-02p requires ALJs to adjudicate CRP claims using the sequential evaluation process, "just as for any other impairment."

23

1   the severity of the injury sustained by the individual." SSR 03-

2   2p.

3

4       However, these were not Plaintiff's only severe impairments.

5   The objective evidence, among other evidence, was relevant to

6   assess the severity of Plaintiff's limitations at least with

7   respect to her other impairments, such as osteoarthritis of the

8   knees and hips and lumbar discogenic disease with radiculopathy.

9   (AR 942); see Rollins, 261 F.3d at 857 ("While subjective pain

10  testimony cannot be rejected on the sole ground that it is not

11  fully corroborated by objective medical evidence, the medical

12  evidence is still a relevant factor in determining the severity of

13  the claimant's pain and its disabling effects."); SSR 16-3p, *5

14  ("objective medical evidence is a useful indicator to help make

15  reasonable conclusions about the intensity and persistence of

16  symptoms, including the effects those symptoms may have on the

17  ability to perform work-related activities"). Here, the ALJ

18  appropriately considered other longitudinal evidence contained in

19  the treatment records, as discussed above, that is relevant to

20  evaluating Plaintiff's credibility and the severity of her symptoms

21  from fibromyalgia and RSD/CRPS. This included doctors'

22  observations that Plaintiff's conservative treatment was helping

23  her, Plaintiff remained able to perform household chores and other

24  activities, she was in no apparent distress, and her fibromyalgia

25  was mild.

26

27      Aside from her own statements, Plaintiff supports her

28  contention that she cannot perform full-time work by pointing to

1    the opinion of Lisa Gause, a nurse practitioner, who opined that

2    Plaintiff would be absent from work three days per month due to

3    fibromyalgia and RSD.[11]  (Joint Stip. at 7-8; see AR 1742).  As the

4    ALJ noted, Nurse Gause's opinion could not be given controlling

5    weight because nurse practitioners are not considered acceptable

6    medical source under Social Security regulations.[12]  (AR 949).  The

7    ALJ gave Nurse Gause's opinion little weight because she found it

8    was "not supported by [Gause's] own treating notes or the other

9    evidence of record."  (AR 949).  Among other things, the ALJ

10   reasoned that "if Ms. Gause's assessment were accurate, one would

11   conclude [Plaintiff] spends a majority of her day lying down, but

12   that situation is simply not borne out by the record, which

13   indicates that while [Plaintiff] may take a nap during the day,

14   she is otherwise either seated, standing or walking and performing

15   her daily activities."  (AR 949).  These are appropriate and

16   sufficient grounds to support the ALJ's decision not to credit the

17   limitations opined by Nurse Gause.  See 20 C.F.R. § 404.1527(c).

18

19        [11]  Nurse Gause also opined, among other things, that
20   Plaintiff could only sit and stand for 20 minutes at one time and
     for less than two hours total during an eight-hour workday, and
21   could rarely lift even ten pounds. (See AR 217-20, 917-20, 1739-
     42).
22

23        [12]  Although a nurse practitioner is not deemed an
     "acceptable medical source" under the Regulations, and thus cannot
24   be given controlling weight, the opinions of such sources may be
     relevant to assessing a claimant's credibility and functional
25   limitations.  See Revels, 874 F.3d at 665 (ALJ erred in failing to
     credit nurse practitioner's opinion); SSR 03-2p ("In cases
26   involving RSDS/CRPS, third-party information, including evidence
     from medical practitioners who have provided services to the
27   individual, and who may or may not be 'acceptable medical sources,'
     is often critical in deciding the individual's credibility.").
28

1    In sum, Plaintiff has failed to identify any material error
2  in the ALJ's assessment of Plaintiff's subjective testimony and
3  her functional limitations.  The ALJ's findings and conclusions
4  must be upheld, as they are based on adequate reasons, under all
5  applicable standards, and supported by substantial evidence in the
6  record.  See Brown-Hunter, 806 F.3d at 492 (ALJ determines
7  credibility, resolves conflicts in the testimony, and resolves
8  ambiguities in the record); Lewis v. Astrue, 498 F.3d 909, 911 (9th
9  Cir. 2007) ("[I]f evidence is susceptible of more than one rational
10 interpretation, the decision of the ALJ must be upheld").
11 Moreover, to the extent Plaintiff suggests that the ALJ erred by
12 failing to expressly cite or discuss the standards applicable to
13 her conditions, any error is harmless because the ALJ applied the
14 correct standards, based on a thorough evaluation of the evidence,
15 appropriately taking into account the longitudinal record and the
16 particular nature of these conditions.  (See 945-52).

17

18                          **CONCLUSION**

19

20    For the foregoing reasons, the decision of the Commissioner
21 is AFFIRMED.

22

23    LET JUDGMENT BE ENTERED ACCORDINGLY.

24

25 Dated: April 30, 2020

26

27                          _____/s/_____
                                 ALKA SAGAR
28                          UNITED STATES MAGISTRATE JUDGE